IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2025 Session

**STATE OF TENNESSEE v. DEVAUNTE LOUIS HILL**

**Appeal from the Criminal Court for Davidson County
No. 2021-B-726      Angelita Blackshear Dalton, Judge**

_____

**No. M2024-00458-CCA-R3-CD**

_____

Defendant, Devaunte Louis Hill, appeals his Davidson County Criminal Court conviction for second degree murder, for which he received a sentence of twenty-five years in confinement. Defendant asserts that: (1) the trial court erred in excluding the testimony of Defendant's proffered expert; (2) the trial court improperly limited Defendant's cross-examination of a witness; (3) the trial court abused its discretion by finding that Defendant opened the door to cross-examination about delinquent behavior he committed as a juvenile; (4) the trial court abused its discretion by allowing the State to present evidence of Defendant's gang membership in its case-in-chief; (5) the trial court improperly admitted part of a recorded jail conversation between Defendant and other parties; (6) the State engaged in improper argument during closing; (7) he is entitled to relief via cumulative error; and (8) the trial court imposed an excessive sentence. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Martesha Johnson Moore, District Public Defender; and Emma Rae Tennent (on appeal), Ellison M. Berryhill (on appeal), Jason Chaffin (at trial), Georgia Sims (at trial), and Allison Capp (at trial), Assistant District Public Defenders, for the appellant, Devaunte Louis Hill.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; Roger D. Moore, Deputy District Attorney General; and Janice Norman and Kristen L. Taylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

This appeal arises from the death of Caitlyn Kaufman ("the victim"), a nurse who driving to work on Interstate 440 ("I-440") in Nashville on the evening of December 3, 2020, when she was shot and killed. Following an investigation, both Defendant and James Edward Cowan ("co-defendant Cowan") were arrested and subsequently indicted by the Davidson County Grand Jury for first degree premeditated murder. They were tried jointly in January 2023.[1]

### *Pretrial Hearings*

Prior to trial, Defendant filed a motion to exclude impermissible character evidence, citing Rules 404(b), 608, and 609 of the Tennessee Rules of Evidence. Defendant sought to exclude "[a]ny and all mention of [his] involvement in alleged gang activity" and evidence of delinquent behavior he committed as a juvenile. The offenses involved a shooting incident that took place when Defendant was fifteen years old, wherein Defendant fired a gun and injured his grandmother and two young relatives. Based upon these offenses, Defendant was adjudicated delinquent in juvenile court on four counts of aggravated assault and one count of handgun possession.

In response, the State asked that the trial court permit evidence related to Defendant's gang affiliation to provide contextual evidence on the relationship between Defendant and co-defendant Cowan. The State argued that Defendant and co-defendant Cowan's being in the same gang would explain why Defendant "would lie to the police and lie to protect [co-defendant] Cowan from any involvement whatsoever in the crime." The State also argued that the proof was needed to explain how its witness, Jacques Merrell-Odom, knew Defendant and co-defendant Cowan to be acquainted. Regarding Defendant's request to exclude his juvenile record, the State agreed that Defendant's "prior juvenile arrests or convictions . . . and any prior acts of violence should not be admissible, unless the issue is raised by the [Defendant] during the trial."

Following a hearing, the trial court issued an order denying the motion with respect to evidence concerning Defendant's membership in a gang but granting the request to exclude evidence of Defendant's juvenile record. The court said that it would allow a "very limited" reference to gang affiliation "for Mr. Merrell-Odom to explain . . . his familiarity with [co-defendant] Cowan." The court found that there was clear and convincing evidence that Defendant was "affiliated with a gang" and held that the evidence was

---

[1] The jury subsequently acquitted co-defendant Cowan.

"relevant to establish the relationship between [Defendant] and [co-defendant Cowan]," as well as "to provide necessary contextual background, particularly in light of [Defendant's] statement to detectives denying the presence of [co-defendant] Cowan in the vehicle." The court also found that such evidence was not substantially outweighed by the danger of unfair prejudice. Regarding evidence of Defendant's criminal behavior for which he was adjudicated delinquent, the trial court found that they were inadmissible "unless rules otherwise permitted by way of opening of the door."

In another pretrial motion, Defendant requested a hearing "pursuant to [Tenn. R. Evid.] 608(b) and 608(c) as to specific instances of conduct of [Mr.] Merrell-Odom regarding his character for truthfulness." At a hearing on the motion, Defendant stated his intent "to ask Mr. Merrell-Odom about many of the specific instances of conduct that occurred when he was a juvenile[,]" and the State conceded that those were admissible.

Defendant also referenced allegations of theft against Mr. Merrell-Odom that were "still pending." Defense counsel stated, "I think we have several different mechanisms to ask about those charges for Mr. Merrell-Odom, whether they go to bias, whether they go to him receiving a benefit, whether they fall under [Rule] 608 as a specific instance of conduct." Aside from giving a general date for each pending charge, however, Defendant did not provide any additional information as to what each alleged instance of conduct involved. Defendant subsequently filed, at the request of the State, a list of the adjudications and pending charges it wished to ask Mr. Merrell-Odom about during cross-examination; the list included two pending felony theft offenses and two pending misdemeanor theft offenses.

The parties also discussed Defendant's request for information, pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), about any deals or promises made to Mr. Merrell-Odom by the State. Regarding the *Giglio* request, the State informed the trial court that it was aware of four indictments against Mr. Merrell-Odom, all pending in a separate division of the Davidson County Criminal Court. The State announced that no promises had been made to Mr. Merrell-Odom concerning the pending charges.

Following the hearing, the trial court entered a written order, finding that Defendant could impeach Mr. Merrell-Odom with any "charges for which he was adjudicated delinquent" pursuant to Rule 608(b) of the Tennessee Rules of Evidence. However, the trial court ruled that the pending theft charges would not be admissible pursuant to Rule 608(b), both because it found that Defendant had provided an insufficient factual basis for inquiry and because any inquiry would implicate Mr. Merrell-Odom's protections against self-incrimination. The trial court further determined that "the prejudicial effect of inquiring into those pending charges unfairly outweighs the probative value of such inquiry."

In an additional motion, Defendant requested that the trial court "exclude all jail calls[.]" The record reflects that, shortly after his arrest, Defendant placed four calls from the Davidson County jail. The calls were recorded and collected by the State as evidence. The parties eventually agreed to several redactions from the calls, and the trial court held a hearing to address portions where no agreement was reached. At the hearing, Defendant specifically took issue with a portion of a jail call that he described as "these two other people speculating about what [his] motive might have been." It occurred during the first call between Defendant and his sister, Fredricka Williams. During the call, Defendant's voice and two female voices are heard in the following exchange:

Female 1: That they did. Ooh, okay, hey, um, this is . . . [Defendant's] sister.

Female 2: Okay, Siray crying a lot, I tried to get what I can out of her.

Female 1: I'm on the phone with him now.

Female 2: What happened?

Female 1: They, they went in my Momma's house and got him.

Female 2: Well they are saying he did that to that nurse?

Female 1: Um, yeah, f*ck yeah, that's what they are saying.

Female 2: Why would he do that? Like is he trying to get into a gang or something?

Female 1: I don't know.

Female 2: But he didn't even know her.

Female 1: You said what [Defendant]?

[Defendant]: I didn't do it.

Female 1: He say he didn't do it.

Defendant asked that the trial court order the State to redact the portion of the conversation between Female 1 and Female 2 that suggested a gang-related motivation for

- 4 -

the shooting. Defendant argued that the exchange between the two females was inadmissible hearsay evidence and that it was speculative and prejudicial.

Following the hearing, the trial court issued an order finding that the challenged comments during the call made by Female 1 and Female 2 were admissible because they were "not being offered for the truth of the matter asserted, but rather to provide context to [Defendant's] responses." The trial court also found that the comments were adopted by Defendant when he stated, "I didn't do it."

The trial for Defendant and co-defendant Cowan was scheduled to begin on January 23, 2023. During a pretrial hearing on January 6, 2023, the State made an oral motion to exclude any expert testimony due to lack of notice. On January 9, 2023, co-defendant Cowan filed a Notice of Intent to Call Expert at Trial, stating that he intended to call John Morris, whom he described as an "expert in the area of digital forensics and cellular phone technologies." Attached to the notice was Mr. Morris's Curriculum Vitae and a "Testimony History," and the notice stated that Mr. Morris would "offer expert testimony regarding certain details and information pertaining to phone records provided in the discovery." In response, the State filed a motion to exclude the testimony of Mr. Morris due to lack of timely notice. The State asserted that co-defendant Cowan failed to provide a report related to Mr. Morris's testimony and that his notice did not state that one would be provided. The State further asserted that Mr. Morris was not qualified to testify in the fields proposed.

At a hearing on January 13, 2023, the parties presented arguments on the State's motion to exclude Mr. Morris's testimony. In an order granting the State's motion, the trial court noted that, as of the date of the hearing, co-defendant Cowan "had not filed a report on which the State or the [trial court] could consider in assessing Mr. Morris'[s] qualifications authorizing him to give an informed opinion on the subject." The court determined that co-defendant Cowan had provided insufficient proof to favorably find that Mr. Morris's proposed expert testimony was both relevant and reliable. Co-defendant Cowan subsequently filed a report from Mr. Morris on January 17, 2023.

At the start of trial, co-defendant Cowan and Defendant requested that the trial court reconsider its order excluding the testimony of Mr. Morris. Counsel for Defendant then informed the trial court that Defendant adopted Mr. Morris as his expert, explaining that "we had our own forensic examiner, independent of [co-defendant Cowan's]. We made a strategic decision . . . not to use our examiner in trial because it would be simply a waste of time and duplicitous evidence." The trial court noted its understanding that Defendant was "joining in on [co-defendant Cowan's] notice."

Then, during a break in jury selection, the trial court held a hearing to reconsider whether it would exclude testimony from Mr. Morris. At the hearing, Mr. Morris testified that he was a licensed attorney. He said that he had a law practice and that he also ran a "digital forensic expert practice or consultancy." He testified that, over the past eight years, around sixty to seventy percent of his over 500 cases involved call detail records and cell phone analysis. Mr. Morris defined digital forensics as a broad term that includes cell phone forensics analysis of the content of cell phones, cellular call detail records and interpretation of those records, and extraction and analysis of cloud and internet data. He described cell phone towers as a big antenna connected to a big computer network. Regarding his qualifications and experience, Mr. Morris testified that he "started slinging code" when he was fourteen and "started using technology when [he] was in high school." He stated that he trained in radio wave propagation with the military in the 1980s and that he worked for Microsoft for fifteen years as a database architect and "as a regional director of their Cloud services practice." Mr. Morris testified that because technology changes so rapidly, he had not attended a formal school or program on these topics; he said that there was no "formal kind of go to school" for members of the public to keep up with the advancing technologies. He said that he stayed up to date on technology by simply reading academic and vendor articles and communicating with tool vendors and service providers. He acknowledged that there are classes for those in law enforcement. Mr. Morris stated that he had been qualified as an expert in Davidson County and in other counties across Middle Tennessee but acknowledged that he had only been certified as an expert in cellular networks twice.

On cross-examination, Mr. Morris testified that data in carrier records must be interpreted based on how data is collected. He testified that he had no vendor specific training in cellular networks but insisted that he understood how systems worked based on information from manufacturers. Mr. Morris testified that he had read articles posted on "MIT blogs" but could not provide titles. He admitted that he had not attended classes in ranging data but testified that he understood physics, technology, and the mechanisms behind ranging data better than the people teaching such courses. He agreed that he had not taken courses in cell system engineering or system load balancing algorithms. Mr. Morris acknowledged previously submitting a report, in which he indicated that law enforcement officers testifying about analyzing call detail records would need training in those areas. Regarding his opinion on the GPS data in this case, Mr. Morris testified that he did not analyze the cell phone extractions because they were not provided in discovery.[2] He said that he was purely tasked with evaluating call detail records.

_____

[2] Following this testimony from Mr. Morris, the State asserted that the cell phone extractions had been provided in discovery. Defense counsel responded that he had provided all relevant material to Mr. Morris for evaluation.

Following Mr. Morris's testimony, the State called its expert, Special Agent Andrew Vallee, with the Tennessee Bureau of Investigation (TBI). Agent Vallee testified that he worked in the TBI's criminal investigation division and was assigned to the cellular analysis survey team. Agent Vallee discussed his specialized training and experience and agreed that he would not proffer himself as an expert if he had "just talked to persons in the industry, read some articles and some blog posts online[.]" At the conclusion of the hearing, the State again moved to exclude testimony from Mr. Morris.

After taking the matter under advisement, the trial court entered an order excluding Mr. Morris as an expert witness, finding that he did not have the necessary qualifications. The court found that Mr. Morris "has not received specialized training in the specific field of cellular analysis" and "has not demonstrated that through his experience and education that he has specialized knowledge to express an opinion in this specific field."

The trial court further found that Defendant failed to demonstrate that Mr. Morris had a basis of knowledge to present testimony related to the GPS data. The court noted,

> Mr. Morris testified he did not evaluate mobile device extractions because he was purely tasked with evaluating [call detail records]. Having not analyzed mobile device extraction[s] in this case, the [c]ourt finds that Mr. Morris'[s] qualifications do not authorize him to give an informed opinion on the subject of GPS data.

### State's Case-in-Chief

Diane Kaufman testified that she last spoke to her daughter, the victim, shortly before 6:00 p.m. on December 3, 2020. She explained that the victim was driving from her apartment in Lebanon to her nursing job at Ascension Saint Thomas West Hospital. Ms. Kaufman said that she got off the phone with the victim in order to run into a store; when she called the victim back at 6:13 p.m., the victim did not answer. Ms. Kaufman testified that she later learned from one of the victim's co-workers that the victim did not show up for her shift. Ms. Kaufman said that, when she looked up the location of the victim's phone, she saw it was stationary on I-440.

Sergeant Brian Thompson, an officer with the Metro Parks Police, testified that he encountered the victim's vehicle on the right shoulder of I-440. He observed that the vehicle was running, that there were bullet holes in the vehicle, that the driver's side back window was shattered, and that the victim was "slumped over to the right towards her shoulder."

Metropolitan Nashville Police Department (MNPD) Officer Cory Stratton testified that he arrived at the scene and initiated emergency medical assistance to the victim. Officer Stratton stated that the victim's vehicle had bullet holes along "the driver's side stretching all the way from the front headlight . . . to the back window." He explained that the victim was unresponsive and that, to reach her, he broke out the vehicle's windows and removed her from the vehicle. Officer Stratton stated that he performed CPR on the victim until emergency medical personnel arrived and pronounced her deceased.

Danielle Connor, a civilian crime scene investigator employed by MNPD, testified that she responded to the scene on I-440 and began documenting and collecting evidence. Ms. Connor explained that she prepared a 3-D FARO scan and diagram of the scene and took numerous photographs. She stated that she documented six bullet "defects" in the victim's vehicle and that she collected three 9mm shell casings along the right shoulder of the roadway behind the victim's vehicle.

MNPD Sergeant Chris Dickerson testified that he served as lead detective in the case. He testified that he collected the victim's cell phone from her car and turned it over to Detective Chad Gish to be analyzed. Sergeant Dickerson said that, when he and other investigators finished working the crime scene on December 3, they did not have any leads on a suspect or a suspect vehicle. He said that, in the days following the shooting, a reward for information grew to over $65,000.

Sergeant Dickerson testified that investigators received a phone call from Mr. Merrell-Odom, who said he had information relating to the case. Sergeant Dickerson stated that he interviewed Mr. Merrell-Odom at the police department. Over the course of a six-hour interview, Mr. Merrell-Odom implicated Defendant by name and co-defendant Cowan using the nickname, "Doodie," and he described the car co-defendant Cowan was driving during the shooting. Mr. Merrell-Odom also told Sergeant Dickerson that he would be able to procure the gun used in the shooting.

Sergeant Dickerson testified that Mr. Merrell-Odom eventually revealed that he already had the gun and told police where it was located. Sergeant Dickerson stated that investigators subsequently retrieved the gun, a Springfield XD 9mm, from the glovebox of Mr. Merrell-Odom's car. Sergeant Dickerson explained that later TBI testing confirmed that three recovered cartridge casings found along I-440 were all fired from the Springfield XD 9mm found in Mr. Merrell-Odom's car.

After Mr. Merrell-Odom revealed that the gun was in his car, Sergeant Dickerson wanted additional reassurance that Mr. Merrell-Odom was not involved in the shooting. To this end, he set up a controlled call between Mr. Merrell-Odom and Defendant. In the recorded call, which was played for the jury during Sergeant Dickerson's testimony, Mr.

Merrell-Odom pretended that his uncle had accused him of being involved in the shooting, and he asked Defendant to confirm that he "was not in the car with you're a*s whenever that sh*t happened to that nurse Caitlyn." Defendant agreed that Mr. Merrell-Odom "wasn't with [him]." He further agreed that Mr. Merrell-Odom "traded [him] an M&P for" the murder weapon.

Sergeant Dickerson testified that he obtained warrants for Defendant's arrest and for the search of Defendant's cell phone and residence. Sergeant Dickerson said that, when officers arrested Defendant, they found a Smith & Wesson M&P .40 caliber firearm under his bed. He stated that, once at the police department, Defendant waived his *Miranda* rights and agreed to speak to him about the shooting. During the interview, Defendant initially said that he was in Atlanta with a female friend in a green Chrysler 200 when the shooting occurred. Sergeant Dickerson testified that he then confronted Defendant with a map showing that Defendant's cell phone put him in the area of the crime scene on I-440 at the time of the offense. Defendant then acknowledged that he had not been in Atlanta on December 3, 2020, and that he "had something to do" with the murder of the victim. Defendant told Sergeant Dickerson that he was driving down I-440 when the victim "cut them off." He claimed that a man named Quan Evans, who was in the car with him, then fired the gun at the victim several times. Sergeant Dickerson explained that Defendant identified a photograph of Mr. Evans during the interview. Sergeant Dickerson said that, when he showed Defendant a photograph of co-defendant Cowan, Defendant claimed that he "didn't know who he was."

Sergeant Dickerson stated that, after Defendant's arrest, Defendant made several recorded phone calls from the jail. The State introduced four of the recorded calls. In one call, a woman talking in the background could be heard asking, "Why would he do that? Like is he trying to get into a gang or something?" Defendant then responded, "I didn't do it."[3] In later phone calls, however, Defendant expressed frustration that Mr. Merrell-Odom "snitched" on him for the reward money. Defendant also admitted to giving investigators a "random name for somebody[,]" whom he claimed was involved in the offense. Defendant said that he denied knowing co-defendant Cowan and that the Smith & Wesson M&P gun officers found when they arrested him was not the murder weapon.

Sergeant Dickerson testified that his further investigation showed that co-defendant Cowan had been with Defendant at the time of the shooting and that co-defendant Cowan was arrested at a hotel in Nashville in January 2021. He explained that investigators

---

[3] Following this testimony, the trial court told the jury that recorded statements by other individuals were "not admitted for the truth of the matter asserted by these people" but instead was to "provide meaning to the statements made by the individual identified as [Defendant]." The court instructed the jury to "never speculate to be true any insinuation suggested by a question asked or comment made during the course of these recorded statements."

learned that co-defendant Cowan and his girlfriend, Dimneshia Carter, had been in possession of a gray Cadillac SUV; the vehicle had been rented in Florida from Hertz and later found abandoned and "burnt down to the frame" in South Nashville. Sergeant Dickerson agreed that the vehicle fire occurred on December 12, 2020, when Defendant was in jail.

Mr. Merrell-Odom testified that, in December 2020, he and Defendant had spoken regularly and had been friends for several years. He said that, in contrast, he had only known co-defendant Cowan for a couple of months and only by the nickname, "Doodie". He testified that co-defendant Cowan drove a Cadillac SUV in December 2020. Mr. Merrell-Odom stated that he had seen co-defendant Cowan and Defendant at Defendant's apartment. He said that he knew Defendant and co-defendant Cowan were close friends and that, to his understanding, Defendant's and co-defendant Cowan's friendship stemmed from their membership in the same gang—98 Mafia Crip. Mr. Merrell-Odom stated he was not a member of that gang; he belonged to Treetop Piru, a Bloods-affiliated gang. Mr. Merrell-Odom acknowledged that he had been adjudicated delinquent as a juvenile for aggravated burglary, attempted burglary, theft, possession of stolen property, and joyriding.

Mr. Merrell-Odom testified that, a few days after the shooting, he was sitting in his car outside of the Panorama Apartments when Defendant came over to talk to him. Defendant told Mr. Merrell-Odom that he had to get rid of his gun, and Mr. Merrell-Odom agreed to trade guns with him. Mr. Merrell-Odom stated that, at the time, Defendant did not explain why he wanted to switch guns.

Mr. Merrell-Odom testified that, later in the evening, he was hanging out at the apartment complex with Defendant, co-defendant Cowan, and some other acquaintances. He said that Defendant was "acting weird" and kept saying, "I done f*cked up." Eventually, Defendant used his phone to show Mr. Merrell-Odom a news article about the victim's shooting. Mr. Merrell-Odom testified that Defendant then told him, away from the larger group, that the shooting happened on the interstate after the victim's car almost hit the vehicle in which he was riding. Defendant told Mr. Merrell-Odom that he thought the victim was someone else and that he shot up her car. Mr. Merrell-Odom testified that, when he and Defendant rejoined the larger group, Defendant kept stating, "I f*cked up," to which co-defendant Cowan replied, "Man, she shouldn't have did that sh*t."

Mr. Merrell-Odom testified that he decided to come forward with information about the shooting after talking with his mother. He said that he had also searched for information about the reward amount on his phone several times before he spoke to the police. He acknowledged that he did not initially tell authorities he already had possession of Defendant's gun. He agreed that he eventually received over $50,000 in reward money for

providing the information that led to the arrest of the individuals responsible for the victim's murder.

On cross-examination, defense counsel attempted to ask Mr. Merrell-Odom about whether he had "some pending cases." The State objected, and a bench conference was held. Referencing the prior *Giglio* hearing and the State's announcement that no promises had been made to Mr. Merrell-Odom, the trial court confirmed that it had excluded all cross-examination about the pending charges. The court reiterated that it had found an insufficient basis to substantiate inquiry under Rule 608 and had concerns about Mr. Merrell-Odom's constitutional rights. The court further determined that "the prejudicial effect of inquiring into those pending charges would unfairly outweigh the probative value of such inquiry."

Officer Doug Belcher, a crime scene investigator with the MNPD, testified that he performed a trajectory analysis of the six bullet holes in the victim's car. Officer Belcher said that he completed a 3-D FARO scan of the vehicle. He explained that the FARO device used lasers to document a scene in three dimensions and that the 3-D processing was then compiled into a FARO trajectory report. He testified that the report in this case documents trajectory data for four of the six bullet defects. He explained that the report provides vertical and horizontal angles to show how each projectile impacted or entered the victim's vehicle. The vertical angle, also known as the inclination angle, shows whether the path of the projectile tended up or down, relative to the ground. The horizontal angle, also known as the azimuth angle, measures whether the projectile came from the left, the right, or straight on. Officer Belcher stated that all four defects measured in the report share a consistent vertical angle but that the horizontal angle measurements show substantial differences. He testified that this variation in the horizontal angles suggests there was motion of one of the vehicles relative to the other; in other words, these measurements would be inconsistent with both vehicles traveling at the same speed. Officer Belcher testified that, if they had been traveling at the same speed, he would expect to have seen a more concentrated defect pattern, with the defects having similar, more straight-on, horizontal angles.

Dr. Erin Carney, the Deputy Chief Medical Examiner at the Davidson County Medical Examiner's Office, testified that she performed the victim's autopsy on December 4, 2020. Dr. Carney stated that her examination of the victim showed that the victim suffered significant internal bleeding from a bullet that entered her left arm, traveled through her lungs and aorta, and lodged in her right arm. Dr. Carney explained that these injuries caused over two liters of blood to fill the victim's chest cavity and around her lungs and resulted in her death. Dr. Carney opined that the victim likely died within seconds to minutes after being shot. She confirmed that the victim's cause of death was a "gunshot wound of the left arm continuing into the chest" and that the manner of death was homicide.

- 11 -

MNPD Detective Chad Gish testified as an expert in digital forensics. Detective Gish testified that he had over 4,200 hours of training, taught and presented on digital forensics around the country, earned multiple certifications from various programs including with the FBI, and was a member in several technical organizations. He said that he had testified as an expert in digital forensics "probably 40 or 50 times" in the Davidson County Criminal Court and estimated "a couple of hundred" times in state and federal courts over his eighteen years of experience.

Detective Gish testified that he analyzed several devices associated with this case, including Defendant's cell phone and records from his cell phone service provider, and compiled his data into a report. Detective Gish said that the data showed that Defendant and co-defendant Cowan were in frequent contact via text messages and phone calls from December 1, 2020, through December 10, 2020. He explained that data from Defendant's phone indicated he and co-defendant Cowan went to Hermitage together during the afternoon on December 3, 2020, and later traveled from Hermitage to pick up Ms. Carter from her job on Woodmont Boulevard. It showed that Defendant and co-defendant Cowan were together shortly before and after the shooting.

Detective Gish testified that he also examined GPS data from the victim's cell phone and created a timeline of her movements that evening based upon that data. Detective Gish explained that the data reflected the victim left her home in Lebanon at approximately 5:45 p.m. and continued her travel until her car came to a stop along westbound I-440, near the West End exit. He said that the location data on the victim's phone allowed him to estimate that she was driving around 71 miles per hour until 6:08 p.m.; she then began to slow down as she drove in the right-hand lane of I-440. He said that, eighteen seconds later, her vehicle came to a stop along the guardrail of the emergency lane.

Detective Gish testified that records from Defendant's phone indicated that he began searching for information about the victim's shooting at 7:37 p.m., before the shooting had come to the attention of law enforcement. At 1:16 a.m. the next morning, Defendant sent a Facebook message to someone asking them to "Trade me sum for da xd." Then, at 2:22 a.m., Defendant accessed a news story about the shooting. Detective Gish stated that phone records also showed that Defendant attended a birthday party for co-defendant Cowan on December 5, 2020.

On cross-examination, the following exchange occurred:

> [Defense counsel:] Okay. Lastly, Detective [Gish], and correct me if I'm wrong, did you testify that based on your data and interpretation that [the victim] was driving on the right side of the road?

[Detective Gish:] That's what it looked like to me was on the right, right on the right side of the interstate, maybe the right lane or maybe the middle lane, just by the way I know where her car was, where it ended up at 6:08 [p.m.], and if you kind of look at the measurements on that Axiom map it is of the right side of the interstate.

. . . .

[Defense counsel:] And that would be based on GPS or some other?

[Detective Gish:] That was the GPS, the markers that we were looking at and watching the track veer to the right side.

[Defense counsel:] Okay.  Okay. So what basically what you are telling is that GPS is -- would be accurate enough to determine a lane that they were in?

[Detective Gish:] Yes.

On redirect examination, Detective Gish stated that, based upon the GPS data from the victim's phone, he concluded that the victim was "probably on one of the right two lanes right there.  I think it's four lanes through there.  I think it would be the right two lanes."

TBI Special Agent Andrew Vallee testified as an expert in cellular communications data and the analysis of that data.  Agent Vallee likewise testified that he had been to "numerous trainings over the years," including the Federal Law Enforcement Training Center, the FBI CAST training "specific to this technology," and "vendor specific training."  He said that he had received forty different certifications and that he teaches "nationwide on various aspects of cellular training, cellular analysis and propagation, [and] how to properly look at records."  Agent Vallee said that he also had experience and training in "radio wave propagation," "cell systems engineering," and "system load balancing algorithms" and that he utilized that technology "every day" in his work.

Agent Vallee testified that he plotted the victim's drive on December 3, 2020, against location information that he collected from a phone belonging to co-defendant Cowan.  He noted that co-defendant Cowan's phone did not have the precise GPS location services that were available on the victim's phone; he said that he reconstructed co-defendant Cowan's phone's approximate movements using cell site data.  He testified that co-defendant Cowan's phone was in the general area of Hermitage at 5:17 p.m. on December 3.

- 13 -

In a series of maps he prepared, Agent Vallee traced the movement of co-defendant Cowan's and the victim's phones and their locations at various times along the route they were both driving. Pink "timing advance arcs" shown on the map depicted co-defendant Cowan's phone's approximate locations based upon the cell site data. Agent Vallee agreed that the arcs did not depict the precise location of the device; rather, taking into account a one-tenth of a mile margin of error, they showed that the phone was somewhere on the pink timing advance arc.

Agent Vallee testified that he also analyzed network data for a phone belonging to Defendant but that his phone was not connected to a network from shortly before 5:00 p.m. until 6:22 p.m. He said that, at 6:22 p.m., Defendant's phone was in the same area as co-defendant Cowan's near where Ms. Carter worked on Woodmont Boulevard.

### *Additional Proffer*

Following the State's case-in-chief, Defendant provided an additional proffer from Mr. Morris, who testified that he would clarify "a couple of items" from the testimony of Detective Gish and Agent Vallee. Mr. Morris stated that Detective Gish inaccurately claimed that, without cell phone service, a phone "will not have GPS data[.]" He claimed that Detective Gish had a fundamental "misunderstanding of the way GPS works." Mr. Morris additionally said that Detective Gish testified "that he doesn't get GPS data from Android devices or that it doesn't store it the same way that the iPhone does"; Mr. Morris stated, however, that he can "get a lot of GPS data from app data bases" on Android devices. Mr. Morris also questioned Detective Gish's "implication that . . . he could determine what lane or close to what lane a vehicle was in" based upon GPS data from a cell phone. He asserted that GPS accuracy for a moving vehicle was "more like [twenty-five] feet[.]" In support of his testimony, Mr. Morris pointed to a disclaimer by Verizon that its "latitude and longitude measurements . . . should not be presumed to be GPS or precise location data."

On cross-examination, Mr. Morris admitted that he had not analyzed any of the mobile device extractions at issue in the case. Mr. Morris acknowledged that the State's expert did not use latitude and longitude measurements in his analysis. When asked if his testimony was that the evidence did not show that co-defendant Cowan's phone was on I-440 at the time of the offense, Mr. Morris responded:

> No, . . . not at all. All I am saying is that if you look at the maps that [were] presented and the arcs they purport to state that the phone is somewhere within the width of that arc.
>
> . . . .

- 14 -

And I am saying that just based on the physics of the way that timing advance works that the arc is simply broader, that does not change the interpretation of the, you know, the phone moved from this part of town to this part of town[.]

The State then recalled Agent Vallee. Agent Vallee testified that he had been taught "in training and in all of other classes that we have gone to of the accuracy level of one-tenth of a mile" for the timing advance data he relied upon in creating the arcs. He said that Mr. Morris was misconstruing the data and agreed that, based upon Mr. Morris's proffered testimony, Mr. Morris was "not trained and not qualified to analyze records and give any opinions about those records[.]"

The trial court entered an order declining to qualify Mr. Morris as an expert, finding that Mr. Morris lacked "the specialized knowledge, skill, experience, training or education necessary to meet the threshold qualifications of an expert." The court also determined that Defendant "failed to demonstrate that Mr. Morris has a basis of knowledge to present testimony related to GPS data in this case."

### *Defense Proof*

Defendant testified on his own behalf. He admitted that he fired the shots that killed the victim and said that co-defendant Cowan was driving the car. Defendant explained that, earlier in the day, he and co-defendant Cowan had been in Hermitage visiting Defendant's brother. He said that they left his brother's house and were on the way to pick up Ms. Carter when the shooting occurred. He testified that, while they were on the interstate in co-defendant Cowan's Cadillac SUV, he was smoking marijuana and had the windows down to "air out" the car. Defendant stated that he had also "[done] a little . . . cocaine and popped a Xanax" before leaving Hermitage.

Defendant claimed that, while on I-440, the victim "just like cut us off." He said that he was "startled" because co-defendant Cowan had to brake and that he "just reacted very quick and irrational" by "picking up the gun and firing the first shot[.]" Defendant testified that he already had the loaded gun in his lap as they drove down the interstate. He asserted that he could not remember how many shots he fired at the victim. At this point, Defendant was asked, "Do you not realize that's dangerous?" Defendant responded, "Yeah. Like as of now, well, I should have known that it was dangerous but like I said I wasn't thinking at the time."

Defendant testified that co-defendant Cowan got off the interstate at the next exit. When he was asked about his "mindset" immediately after the shooting, Defendant said, "At that time it was still, like, full of like rage a little bit, like, so I wasn't, I wasn't as calm

- 15 -

as I should have been." He said that he "couldn't explain" why he got so mad but that "it just was a reaction." Defendant reiterated, "This wasn't supposed to happen. She cut us off."

The following exchange then occurred:

[Defense counsel:] When you fired that shot did you see the vehicle anymore?

[Defendant:] No, I didn't.

[Defense counsel:] You didn't stop?

[Defendant:] No.

[Defense counsel:] What did you think had happened?

[Defendant:] At the time I wasn't thinking anything but I should've known that I could have hurt someone or that somebody could have been injured.

Defendant admitted that he tried to get rid of the murder weapon by giving it to Mr. Merrell-Odom. He also admitted that he lied to Sergeant Dickerson repeatedly when they spoke after Defendant's arrest. He said that, at various times, he claimed to be in Atlanta at the time of the shooting, made up the name "Quan Evans," denied being the shooter, and denied knowing co-defendant Cowan when shown a photograph of him. Defendant explained that co-defendant Cowan was his cousin, and he agreed that they were in the same gang. Defendant explained that he lied because "that's my friend, also my family, and in times like hard times you protect your friends and family[.]" Defendant testified that co-defendant Cowan "didn't do anything wrong[,]" that "all he did was drive a car[,]" and that co-defendant Cowan did not know he was going to shoot the victim.

During a bench conference, the State requested that it be allowed to cross-examine Defendant about the shooting incident Defendant was involved in as a juvenile. The State asserted that Defendant "opened the door to that impeachment" when Defendant insinuated that he did not know that someone could have been injured when he fired the gun. In response, defense counsel contended that Defendant did not testify that he did not know that firing a gun could hurt someone; defense counsel asserted that Defendant's testimony was that he should have thought about that fact, not that he did not know that fact. The trial court ruled that Defendant had opened the door to evidence of the prior shootings by implying that he had not known he could hurt someone when firing his gun. The court

determined that Defendant's "should have known" statements insinuated that "he did not know that by discharging the firearm that he could have hurt someone."

On cross-examination, Defendant confirmed that he was twenty-one years old in 2020. He acknowledged that he and co-defendant Cowan were both members of the 98 Mafia Crip gang, and he agreed that he covered for and protected co-defendant Cowan when speaking to investigators. Defendant denied that the shooting was done to impress co-defendant Cowan. Defendant acknowledged that he attended co-defendant Cowan's birthday party on December 5, 2020. The following colloquy then occurred:

> [The State:] And you sat here today on direct and told this jury that you didn't know that someone would be seriously injured with you fired your gun multiple times out of that window?

> [Defendant:] I said I should have known because I wasn't in the right state of mind and I wasn't thinking. I should have known someone was harmed.

> [The State:] You should have known because you fired a gun before?

> [Defendant:] And I said I wasn't thinking at that moment.

> [The State:] [Defendant], you should have known, because not only have you fired a gun before, but you fired a gun that has hit someone, your bullets have struck another person?

> [Defendant:] Yes. They have and at that time --

> . . . .

> I was young and made a stupid and irrational decision at that time and them same people that was harmed forgave and still showed me unconditional love.

> [The State:] [Defendant], you fired a gun, not at one person, not at two people, at multiple people and you struck three people with your gun fire before?

> [Defendant:] Yes.

> [The State:] And they were injured?

- 17 -

[Defendant:] Yes.

Dr. Eric Warren, a former TBI analyst and co-owner of a forensic consulting firm, testified as an expert witness in the fields of firearm and toolmark identification and shooting incident reconstruction. Dr. Warren testified that he reviewed Officer Belcher's trajectory report and case file and watched his trial testimony. He said that, generally, he agreed with Officer Belcher's findings as they related to the trajectories of the bullet defects found in the victim's car. Dr. Warren agreed that defects 1, 4, 5, and 6 shared the same vertical angle. He concluded that there was no change in positioning with respect to the height of the shooter and target, meaning that the shots all originated from the same vertical angle. He stated that this finding was consistent with the shooter's firearm being in a stationary position as it moved past the victim's vehicle. Dr. Warren said that the horizontal angles depicted a progression of movement and showed movement between the victim's and the shooter's vehicles. He explained that the change in horizontal angles indicated relative movement between the two cars and that they were not traveling at the same speed when the shots were fired. He said that, with the data he had available, he could not say how fast one car was going compared to the other and could not determine which vehicle was traveling faster. He testified that the data was inconsistent with "pacing" by one of the vehicles. Dr. Warren opined that the static vertical angles indicated that the shooter's hand did not move to track the victim's car as it fired the gun. He testified that the most likely scenario involved the shooter's vehicle overtaking and passing the victim's vehicle as the shots were fired.

Dr. Warren testified that he also examined the reports and case file relating to the State's testing of the murder weapon. Dr. Warren stated that, when firing a semiautomatic weapon like the Springfield XD 9mm, the trigger must be pulled for each shot. He noted, however, this type of gun has a "trigger reset" feature, which means that once the trigger is pulled, subsequent rounds can be fired without having the trigger return all the way back to the starting position. Dr. Warren testified that the evidence he reviewed regarding both the firearm and the shooting incident point to an event that unfolded very rapidly.

### *Closing Arguments*

During rebuttal argument, the prosecutor commented on defense counsel's use of the term "commonsense" in his closing argument, stating:

> That commonsense, that is definitely something that these two defendants cared little or nothing about having and, yes, you heard about the gang membership and the family, because that's what for [Defendant], a loyal solider, yes, I want something lesser, but if I can help my cousin, associate, beat the rap too I'm going to do what I can. That's loyalty.

- 18 -

Defendant objected to the commentary and requested that the trial court declare a mistrial, but the court overruled the objection and denied Defendant's request for a mistrial.

Following deliberations, the jury found Defendant guilty of the lesser-included offense of second degree murder, and it acquitted co-defendant Cowan.

### Sentencing Hearing

At Defendant's sentencing hearing, the trial court admitted the presentence report as an exhibit. The report's Strong-R assessment showed that Defendant was a "high violent" risk to reoffend. In addition to the presentence report, the State submitted adjudications showing that Defendant had been found delinquent for possession of a handgun, robbery, and four counts of aggravated assault. The State also offered victim impact statements from the victim's mother and uncle.

Defendant's sister, Fredricka Williams, testified on his behalf. Ms. Williams explained that she was eleven years older than Defendant and that they had six siblings. Ms. Williams testified that their father was in and out of jail as they grew up and never lived with them. She said that their mother was also incarcerated at various times in Defendant's childhood, during which time Defendant's grandmother cared for him.

Ms. Williams testified that, when Defendant was three years old, he was attacked by a pack of dogs outside of his apartment and that he suffered injuries requiring hospitalization. Ms. Williams stated that their mother was again briefly incarcerated when Defendant was fifteen years old. She said that, during their mother's absence, Defendant was injured when a friend shot him in the leg. Ms. Williams stated that the incident affected Defendant emotionally and that he started to develop an anger issue. Ms. Williams acknowledged that, when he was fifteen years old, Defendant fired a gun inside of his apartment, striking his grandmother in the abdomen and injuring his sister and niece. She said that, although she was not in the apartment when this shooting occurred, she understood that Defendant shot his grandmother because he did not want to go to school. Ms. Williams explained that their grandmother was hospitalized for four days but recovered, as did the children Defendant injured. Ms. Williams testified that, after the shooting, Defendant was placed in Woodland Hills, a juvenile detention center. Ms. Williams noted that Defendant graduated from high school one year early while at Woodland Hills.

Ms. Williams acknowledged that Defendant was affiliated with a gang but said that she did not know much about his involvement. She confirmed that, after his release from Woodland Hills, Defendant robbed a pizza delivery driver at gunpoint; she said that he was found delinquent on a charge of robbery and returned to Woodland Hills.

In an allocution statement, Defendant acknowledged that his actions destroyed two families. Defendant apologized to the victim's family for causing the loss of the victim. He also apologized to his family and his two young children. Finally, Defendant submitted a binder containing several items he believed were relevant to sentencing, including six letters of support from friends and family.

Following the hearing, the trial court entered a sentencing order. The court first noted that it had considered the applicable statutory scheme, the proof presented at trial and sentencing, and the presentence report. It found that Defendant had no prior convictions as an adult and, therefore, was a Range I offender.

The trial court then addressed each mitigating factor argued by Defendant. It declined to find that Defendant lacked judgment because of his youth, highlighting that Defendant "failed to adequately demonstrate the nexus between the impact of his childhood experiences and his intellectual development" with "how those experiences impacted his thought process in the present case." The trial court found that nothing in the record supported a finding that there was no sustained intent to violate the law, and the court determined that Defendant had no remorse for his conduct and even "collud[ed] with others" to attempt to intimidate Mr. Merrell-Odom. As such, the court declined to find that any mitigating factors applied. Regarding enhancement factors, the trial court first found that Defendant had engaged in criminal behavior in addition to that necessary to establish his range. Second, it found that Defendant "was a leader in the commission of an offense involving two (2) or more criminal actors." The court noted that the jury had acquitted co-defendant Cowan; nevertheless, the court found that a preponderance of the evidence showed co-defendant Cowan's involvement. The trial court also found that Defendant possessed or employed a firearm during the commission of the offense and that Defendant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed as an adult." Weighing all of these factors, the court found that the appropriate sentence was twenty-five years' incarceration.

Defendant subsequently filed a timely motion for new trial and an amended motion for new trial. Following a hearing, the trial court entered a written order denying the motion for new trial. This timely appeal follows.

## II. Analysis

### A. Exclusion of Testimony by Mr. Morris

#### 1. Rule 702

Defendant contends that the trial court abused its discretion by prohibiting his proffered expert in "digital forensics and cellular phone technologies," Mr. Morris, from testifying. He argues that the trial court merely "thought that the State's expert was better and so it prevented [Defendant's] expert from testifying." Citing Tennessee Rule of Evidence 702, Defendant insists that because Mr. Morris had worked in forensic cell phone analysis "for many years in many cases[,]" the trial court had a reasonable basis for determining that he was an expert. He argues that formal schooling and classes are not a prerequisite to being qualified as an expert and that Mr. Morris had sufficient "experience" to serve as the basis for his expertise. Defendant contends that he was "significantly prejudiced" by the trial court's exclusion of Mr. Morris's testimony because it would have shown that Defendant and co-defendant Cowan had not been following the victim for several miles before the shooting.

The State responds that the trial court did not abuse its discretion when it determined that Mr. Morris lacked the proper qualifications and specialized knowledge to testify as an expert in this case.

A trial court's decision regarding the "admissibility, qualifications, relevancy and competency of expert testimony" is subject to review under an abuse of discretion standard. *State v. Watkins*, 648 S.W.3d 235, 260 (Tenn. Crim. App. 2021) (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997)). "[A]n abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citation and internal quotation marks omitted). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Moore v. Lee*, 644 S.W.3d 59, 63 (Tenn. 2022) (citation and internal quotation marks omitted).

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides, however, that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. R. 703.

In *State v. Scott*, 275 S.W.3d 395 (Tenn. 2009), our supreme court further defined the role of the trial court in assessing the propriety of expert testimony, stating:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*Id*. at 401-02 (internal citations and quotation marks omitted).

When assessing the admissibility of expert testimony, the trial court must first make a determination that the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of the expert's expertise. Tenn. R. Evid. 702. "The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis in original).

Turning to the facts in this case, we cannot conclude that the trial court abused its discretion by refusing to admit Mr. Morris as an expert witness. In exercising its role as gatekeeper, the trial court's reliability analysis focused on an assessment of Mr. Morris's qualifications. Although Mr. Morris testified that he previously worked for Microsoft for fifteen years, he failed to explain how being a "database architect" or a regional director of "Cloud services practice" provided any training or experience in digital forensics and cellular phone technologies. Likewise, Defendant failed to establish how Mr. Morris's training in radio wave propagation with the military in the 1980s qualified him to discuss current technologies at issue here. Mr. Morris admitted that there was no "formal kind of go to school" for civilians to train on the advanced technologies at issue. Rather, Mr. Morris stated that he simply spoke with "others in the industry" and read "some articles and some blog posts online[,]" and he acknowledged that he had only twice been certified as an expert in cellular networks. Put simply, Defendant's proffer did not show that Mr. Morris's qualifications authorized him to give an informed opinion on the highly technical subjects at issue in this case, and it was reasonable for the trial court to find that "reading academic articles and communicating with professionals" was not sufficient "specialized training." Likewise, the court properly exercised its discretion in finding that Defendant

failed to demonstrate that Mr. Morris had a basis of knowledge to present testimony related to the GPS data in this case.

In his brief, Defendant cites to cases wherein this court has "approved determinations that people were experts when they lacked degrees in a field but merely had practical or professional experience." *See e.g., State v. Elliot*, 366 S.W.3d 139, 147 (Tenn. Crim. App. 2010); *State v. Flannel*, No. W2007-00678-CCA-R3-CD, 2008 WL 4613829, at *14 (Tenn. Crim. App. Oct. 13, 2008), *perm. app. denied* (Tenn. Mar. 23, 2009). We note, however, that the areas of expertise at issue in those cases—handwriting analysis and knowledge of the drug trade—were far less scientific than that involved here. In this case, the trial court reasonably required more "specialized" training for a subject as technical and complex as digital forensics and cellular phone technologies.

The trial court did not abuse its discretion by finding that Mr. Morris's qualifications did not authorize him to give an informed opinion on the subject at issue. *Stevens*, 78 S.W.3d at 834. Defendant is not entitled to relief.

## *2. Right to Present a Defense*

Defendant further contends that, even if Mr. Morris's proffered testimony was properly excluded under Rule 702, the trial court's decision was a violation of Defendant's constitutional right to present a defense. He argues that Mr. Morris's testimony was critical to the defense, that it contained sufficient indicia of reliability, and that there was no substantially important interest in preventing Mr. Morris from testifying as an expert. The State responds that Defendant waived this claim by failing to raise it before the trial court when proffering Mr. Morris's testimony.

Appellate review is generally limited to issues that a party properly preserves for review by raising them in the trial court and on appeal. *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018). "In deciding whether a party has waived an issue on appeal, we do not exalt form over substance but instead review the record carefully to determine whether a party is raising an issue for the first time on appeal." *State v. Harbison*, 539 S.W.3d 149, 165 (Tenn. 2018).

Our review of the record indicates that Defendant raised this claim before the trial court. Following the initial proffer from Mr. Morris, defense counsel argued:

> It's for the [c]ourt to make that determination and I just want to make one more thing clear for the record, aside from Rule 16, and what all these rules require, this is a Constitutional violation . . . we are getting into due

process rights to present a defense and we're being prohibited from doing that[.]

After the additional proffer from Mr. Morris, defense counsel again asserted that "[t]o prevent the defense from presenting its own perspective on what the data shows would prevent [Defendant] from getting his fundamental right to present that defense." Moreover, in his motion for new trial, Defendant specifically argued that the trial court's ruling denied him "a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1 Section 8 of the Tennessee State Constitution." We cannot conclude that Defendant has waived consideration of this issue.

"Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007). "Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." *Id*. at 316 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)).

The right to present witnesses, while of critical importance, is not absolute. *Brown*, 29 S.W.3d at 432 (quoting *Chambers*, 410 U.S at 295). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id*. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301).

Upon review, we cannot conclude that Mr. Morris's proffered testimony was critical to the defense. Mr. Morris did not dispute that Defendant's phone was near co-defendant Cowan's shortly before and after the shooting, that co-defendant Cowan's phone was in the general area of the murder when it happened, or that Defendant began searching for news about the murder before police learned of it. Rather, he took issue with Detective Gish's comment that "a cell phone can't record or utilize GPS without a network connection," felt it was "a mischaracterization that you can make an assumption or opinion as to what lane a vehicle is in from GPS data on a cell phone," and said that the Timing Advance Data arcs provided by Agent Vallee were "too narrow." These opinions, had they

been presented to the jury, would not have changed the outcome in any way. Defendant also suggests in his brief that Mr. Morris would have disagreed with the State's assertion that he and co-defendant Cowan "had been following [the victim] for several miles before the shooting[,]" but Mr. Morris offered no such testimony. Even if he had, and even if the jury fully accredited it, Defendant has not shown that the jury would have returned a lesser verdict.

As previously discussed, the trial court found and the record reflects that Mr. Morris lacked the qualifications to give an informed opinion on the subject at issue; thus, Defendant has not shown that Mr. Morris's testimony bore sufficient indicia of reliability. Lastly, the interest in preventing an unqualified person from giving expert testimony is substantially important. The exclusion of Mr. Morris's proffered expert testimony did not rise to the level of a constitutional violation. As such, Defendant is not entitled to relief.

### B. Limitation of Cross-Examination of Mr. Merrell-Odom

#### 1. Rule 608

Defendant argues that the trial court abused its discretion by preventing him from cross-examining Mr. Merrell-Odom about his pending theft charges. Defendant contends that, under Tennessee Rule of Evidence 608(b), the trial court should have permitted him to impeach Mr. Merrell-Odom regarding these specific instances of conduct as they "were probative of the witness's untruthfulness[.]"

The State responds that the trial court properly exercised its discretion because Defendant did not identify any specific instances of conduct and because the probative value did not substantially outweigh the prejudicial effect.

"Tennessee Rule of Evidence 608(b) provides that specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness." *State v. Ramirez*, No. M2009-01617-CCA-R3-CD, 2011 WL 2348464, at *13 (Tenn. Crim. App. Jun. 8, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011). Before a witness may be cross-examined on specific instances of conduct, the trial court must, upon request, hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry. Tenn. R. Evid. 608(b)(1). When the trial court complies with the procedural requirements of Rule 608(b), we review the trial court's decision under an abuse of discretion standard. *Ramirez*, 2011 WL 2348464, at *14.

Prior to trial, Defendant requested a hearing pursuant to Rule 608 of the Tennessee Rules of Evidence on the admissibility of "specific instances of conduct of [Mr.] Merrell-

Odom regarding his character for truthfulness." The trial court conducted a hearing, during which Defendant referenced three allegations of theft against Mr. Merrell-Odom that were "still pending." Following the hearing, the trial court entered a written order, finding that the pending theft charges would not be admissible as impeachment pursuant to Rule 608(b). The court found that Defendant had provided an insufficient factual basis for inquiry and that any inquiry would implicate Mr. Merrell-Odom's protections against self-incrimination.

Here, the trial court's ruling was not an abuse of discretion. Aside from giving a general date for each charge, Defendant did not put on any proof at the hearing as to the alleged instances of conduct. He did not attempt to question Mr. Merrell-Odom about the pending charges, so it is unclear whether Mr. Merrell-Odom would have asserted his Fifth Amendment right against self-incrimination or, if he had not asserted this right, what his answers would have been regarding these alleged instances of conduct. This court has held that a trial court can limit the examination of a testifying witness if the answers to certain questions will result in the witness asserting the Fifth Amendment privilege against self-incrimination. *See e.g., State v. Lakins*, No. 03C01-9703-CR-00085, 1998 WL 128842, at *4 (Tenn. Crim. App. Mar. 24, 1998) (affirming a trial court's limiting the examination of a witness on issues where the witness would assert his Fifth Amendment privilege but permitting examination on other issues), *perm. app. denied* (Tenn. Nov. 2, 1998). Under these circumstances, the trial court did not abuse its discretion, and Defendant is not entitled to relief.

## 2. Right to Confrontation

Defendant further argues that the trial court's ruling violated his constitutional right to confront witnesses against him. He contends that the trial court should have permitted inquiry into the pending charges as evidence of Mr. Merrell-Odom's bias and that the State cannot show that the error was harmless beyond a reasonable doubt.

In response, the State asserts that Defendant failed to raise before the trial court a claim that the court's ruling violated his right to confrontation and that, therefore, the issue is waived.

Regarding the State's waiver argument, our review of the record shows that, in his pretrial motion requesting that he be allowed to question Mr. Merrell-Odom regarding specific instances of conduct, Defendant argued that they were admissible under Rule 608, as "specific instances of untruthfulness." He further asserted that inquiring about the specific instances of conduct was "fundamental to [Defendant's] due process right to confront the witnesses against him under both Federal and Tennessee constitutions." Then, in his motion for new trial, Defendant argued that the pending charges were "relevant to

Mr. Merrell-Odom's bias and incentive to assist the State with the hope of leniency in his own criminal cases" and that the trial court's restriction of his cross-examination regarding the pending charges violated Defendant's "right to confront witnesses against him under the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution." Thus, Defendant did not waive this claim.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to confront and cross-examine witnesses brought against him or her. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001), our supreme court explained:

> A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994); *see also State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). An undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *See Smith*, 893 S.W.2d at 924; *see also State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991).

"The feelings that a witness has with regard to a party or issue are an important factor for the trier of fact to consider in assessing the weight to be given to the witness' testimony." *State v. Williams*, 827 S.W.2d 804, 808 (Tenn. Crim. App. 1991); *see Creeping Bear v. State*, 87 S.W. 653, 653 (Tenn. 1905) ("It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony.").

The propriety, scope, manner, and control of the cross-examination of witnesses rests within the sound discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *Sayles*, 49 S.W.3d at 279. To show a violation of the right to confrontation, the defendant must show that "'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability

of the witnesses.'" *State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

During trial, defense counsel attempted to ask Mr. Merrell-Odom about whether he had "some pending cases." The State objected, and a bench conference was held. Referencing the prior *Giglio* hearing and the State's announcement that no promises had been made to Mr. Merrell-Odom, the trial court confirmed that it was excluding all cross-examination about the pending charges.

Here, Defendant was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness. That Mr. Merrell-Odom had pending charges against him was certainly relevant to show his potential bias in favor of the State. A potential for bias exists when "a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial [because] . . . there is certainly the possibility that the prosecutor's office is going to take favorable testimony into account when subsequently prosecuting the witness's pending charge." *State v. Taylor*, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. July 9, 2003), *perm. app. denied* (Tenn. Oct. 6, 2003). Thus, Defendant has established a violation of his right to confrontation.

We conclude, however, that the error was harmless beyond a reasonable doubt. Tennessee law recognizes three categories of error: (1) structural constitutional error, which requires automatic reversal; (2) non-structural constitutional error, which is subject to constitutional harmless error review; and (3) non-constitutional error, which is subject to a less demanding harmlessness standard. *See State v. Climer*, 400 S.W.3d 537, 569 (Tenn. 2013) (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). A limitation on cross-examination implicates the constitutional right to confrontation, but it constitutes a non-structural constitutional error and does not require automatic reversal. *See State v. Howell*, 868 S.W.2d 238, 253 (Tenn. 1993). The applicable standard is whether the State has demonstrated "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Rodriguez*, 254 S.W.3d at 371 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

When determining whether a limitation on impeachment was harmless, a reviewing court asks "whether, assuming that the damaging potential of the cross-examination were fully realized, the error was nonetheless harmless beyond a reasonable doubt." *Howell*, 868 S.W.2d at 253 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Relevant considerations to this inquiry include: (1) the importance of the witness's testimony to the State's case; (2) the cumulative nature of the testimony; (3) the presence or absence of corroborating or contradicting evidence on material points; (4) the extent of cross-

examination otherwise permitted; and (5) the overall strength of the prosecution's case. *See id.*

We conclude that, even if the jury had heard that Mr. Merrell-Odom had pending theft charges in Davidson County, this information would have had minimal impact at trial, especially where Mr. Merrell-Odom's statements to police were fully corroborated by recorded phone calls; his possession of the murder weapon, which Defendant admitted giving him after the shooting; Defendant's phone records; and most importantly, Defendant's own admission of guilt. Moreover, even if the jury had heard the erroneously excluded evidence and completely discredited the testimony of Mr. Merrell-Odom, there was still sufficient evidence in the record to support Defendant's conviction for second degree murder. Therefore, the error was harmless beyond a reasonable doubt.

### C. Admission of Evidence of Juvenile Offenses

Defendant asserts that the trial court abused its discretion by finding that he "opened the door" during his direct examination to the admission of evidence of a prior shooting he committed when he was fifteen years old, which the trial court previously ruled was inadmissible. Defendant denies that he offered misleading testimony and insists that at no point in his direct examination testimony did he say "that he did not know that firing a gun could hurt someone. He said he should have thought about that fact, not that he did not know that fact." Defendant contends that the trial court "misconstrued" his testimony and that, viewed in context, "the testimony . . . is more correctly and reasonably construed as [Defendant's] way of describing his thoughtless, reactive state of mind at the time he fired the gun."

The State responds that the trial court properly exercised its discretion in finding that Defendant's testimony opened the door to the admission of this evidence.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion[.]" *McCaleb*, 582 S.W.3d at 186 (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *Harbison*, 539 S.W.3d at 159. Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the

appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id*.

Our supreme court has recognized that, "[e]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). "When a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id*. (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1). "In short, 'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *Id*.

This court has recently explained,

"[O]pening the door is a doctrine intended to serve fairness and truth-seeking." *State v. Vance*, 596 S.W.3d 229, 250 (Tenn. 2020) (citing *Ramirez v. State*, 739 So.2d 568, 579 (Fla. 1999)). Accordingly, "the remedy sought after a party has opened the door should be both relevant and proportional." *Id*. at 250-51. "The otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that necessary to correct a misleading advantage created by the evidence that opened the door." *Id*. at 251 (citing *State v. Gaudet*, 97 A.3d 640, 646 (N.H. 2014)).

*State v. Forte*, No. E2022-01216-CCA-R3-CD, 2025 WL 1420366, at \*19 (Tenn. Crim. App. May 16, 2025), *perm. app. denied* (Tenn. Oct. 8, 2025).

Prior to trial, Defendant filed a motion to exclude impermissible character evidence, citing Rules 404(b), 608, and 609 of the Tennessee Rules of Evidence. Defendant sought to exclude evidence of offenses he committed as a juvenile; these offenses involved a shooting incident that took place when Defendant was fifteen years old, wherein Defendant fired a gun and injured his grandmother and two young relatives. Based upon these offenses, Defendant was adjudicated delinquent in juvenile court on four counts of aggravated assault and one count of handgun possession. At a hearing on Defendant's motion, the State agreed that Defendant's "prior juvenile arrests or convictions . . . and any prior acts of violence should not be admissible, unless the issue is raised by the [Defendant] during the trial[,]" and the trial court found that they were inadmissible "unless rules otherwise permitted by way of opening of the door."

During his direct examination testimony, Defendant claimed that, while on I-440, the victim "just like cut us off." He said that he was "startled" because co-defendant Cowan had to brake and that he "just reacted very quick and irrational" by "picking up the gun and firing the first shot[.]" Defendant testified that he already had the loaded gun in his lap as they drove down the interstate. He asserted that he could not remember how many shots he fired at the victim. At this point, Defendant was asked by defense counsel, "Do you not realize that's dangerous?" Defendant responded, "Yeah. Like as of now, well, I should have known that it was dangerous but like I said I wasn't thinking at the time." Defendant further commented, "I should've known that I could have hurt someone or that somebody could have been injured."

During a subsequent bench conference, the State requested that it be allowed to cross-examine Defendant about the shooting incident Defendant was involved in as a juvenile. The State asserted that Defendant "opened the door" when Defendant insinuated that he did not know that someone could have been injured when he fired the gun. In response, defense counsel contended that Defendant did not testify that he did not know that firing a gun could hurt someone; defense counsel asserted that Defendant's testimony was that he should have thought about that fact, not that he did not know that fact. The trial court ruled that Defendant had opened the door to evidence of the prior shootings by implying that he had not known he could hurt someone when firing his gun. The court determined that Defendant's "should have known" statements insinuated that "he did not know that by discharging the firearm that he could have hurt someone."

Here, the trial court did not abuse its discretion by finding that Defendant's testimony opened the door for the State to question him regarding the prior shooting. On direct examination, Defendant told the jury that he should have known what could happen when he fired the weapon, thus suggesting that he did not know at the time. The trial court, having heard and seen Defendant's live testimony, determined that the comments "insinuate[d] that he did not know that by discharging the firearm that he could have hurt someone." Accordingly, it was reasonable to allow the State to correct that misleading comment by establishing Defendant's direct knowledge that the firing a gun at someone was dangerous and could cause injury. This was a proper exercise of discretion.

In his brief, Defendant argues that "even if the doctrine was applicable here, the trial court should have applied it only so far as was necessary to shield the State from any unfair advantage." Defendant maintains that allowing the State to ask "if he's familiar with guns" would have been sufficient. Like the trial court, we disagree that this question would have clarified Defendant's misleading testimony; it would not have directly contradicted Defendant's insinuation that he was unaware firing a gun was dangerous and could cause injury. The court properly exercised its discretion, sufficiently narrowed the clarifying

question, and prevented the State from identifying the prior shooting victims, who were Defendant's relatives. Under these facts, relief is not warranted.

We further note that, even if the trial court's ruling were in error, it would be harmless considering the overwhelming evidence against Defendant. *See State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (stating that evidentiary errors are examined using a harmless error standard, in which "the defendant bears the burden of showing that the erroneous evidence 'more probably than not' affected the verdict") (quoting Tenn. R. App. P. 36(b)). Defendant admitted to shooting and killing the victim in a targeted attack after she "cut them off." He fired six shots directly into her car as he and co-defendant Cowan drove past her. As she was driving, one of the bullets entered the victim's left arm, traveled across through her lungs and aorta, and lodged in her right arm, resulting in her death moments later. From this evidence alone, any rational jury would find that Defendant knowingly committed murder. Defendant has not shown the admission of the challenged evidence more probably than not affected the verdict. He is not entitled to relief.

### D. Evidence of Defendant's Gang Membership

Defendant contends that trial court improperly allowed the State to present evidence of his gang membership in violation of Rule 404(b) of the Tennessee Rules of Evidence. He contends that the trial court failed to substantially comply with the requirements of Rule 404(b) by failing to apply the appropriate standard for balancing the probative value of the evidence and the prejudicial effect. Defendant argues that the probative value of this evidence was negligible and that any probative value was outweighed by the danger of unfair prejudice. Defendant maintains that, although the fact of his friendship with co-defendant Cowan has some probative value, the "State had ample proof of their close connection outside of anything gang-related" and that nothing the State needed to prove hinged on the nature of his relationship with co-defendant Cowan.

The State responds that the trial court properly allowed gang evidence to show Defendant's connection to co-defendant Cowan and that any potential error was harmless.

Tennessee law provides that proof of other crimes, wrongs, or acts committed by the defendant is not admissible to prove the defendant's propensity to commit a crime. *See* Tenn. R. Evid. 404(b); *Rodriguez*, 254 S.W.3d at 375-76. Here, the trial court admitted evidence from Mr. Merrell-Odom that Defendant and co-defendant Cowan were members of the 98 Mafia Crip gang.

Rule 404(b) provides:

Other Crimes, Wrongs, or Acts. — Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Where the court substantially complies with these procedural requirements, its decision is reviewed for an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005).

The record in this case demonstrates that the trial court substantially complied with the structure detailed in Rule 404(b). The trial court held a jury-out hearing and found that there was clear and convincing evidence Defendant was "affiliated with a gang" and that a material issue other than propensity existed. The court ruled that it would allow a "very limited" reference to gang affiliation "for Mr. Merrell-Odom to explain . . . his familiarity with [co-defendant] Cowan" and found that such evidence was "relevant to establish the relationship between [Defendant] and [co-defendant Cowan]," as well as "to provide necessary contextual background, particularly in light of [Defendant's] statement to detectives denying the presence of [co-defendant] Cowan in the vehicle." Finally, the court balanced the probative value against the risk of unfair prejudice, concluding that the probative value was "not substantially outweighed by the danger of unfair prejudice."

Defendant argues that our review should be de novo because the trial court "turned to the balancing test set forth in Tenn. R. Evid. 403." However, this court has found substantial compliance where a court used the same language as here. *State v. March*, 395 S.W.3d 738, 783 (Tenn. Crim. App. 2011) (finding that "the trial court complied with the requirements of Rule 404(b) by finding . . . that the probative value of the evidence was

- 33 -

not substantially outweighed by the danger of unfair prejudice"). Thus, we will reverse the trial court's decision to admit evidence of Defendant's gang affiliation only upon finding an abuse of discretion. *See Clark*, 452 S.W.3d at 287; *Thacker*, 164 S.W.3d at 240.

We conclude that the trial court did not abuse its discretion in admitting the evidence of Defendant's and co-defendant Cowan's gang membership. The information explained Defendant's affiliation with co-defendant Cowan and how the two knew each other; it also explained Defendant's refusal to identify co-defendant Cowan to investigators and provided a motive for Defendant's attempt to absolve co-defendant Cowan of any responsibility at trial. Additionally, the probative value of evidence was not outweighed by the risk of unfair prejudice. In his brief, Defendant argues that the risk of unfair prejudice stemmed from the State's "suggesting that [he] committed the crime to impress [co-defendant] Cowan and that their gang affiliation explained why [Defendant] lied to police and testified at trial that [co-defendant] Cowan had nothing to do with the shooting." However, although the State asked Defendant on cross-examination if he had been trying to impress co-defendant Cowan, it did not mention their gang affiliation during that line of questioning. As to the second risk of unfair prejudice identified by Defendant, we agree with the State that this "was instead the probative value of introducing the conduct. [D]efendant has failed establish how this logical inference creates a risk of 'unfair' prejudice." Under these circumstances, we cannot conclude that the trial court abused its discretion in admitting this evidence. Defendant is not entitled to relief.

### E. Admission of Hearsay Statements in Recorded Jail Call

During trial, the trial court admitted recordings of several phone calls made by Defendant while he was in jail following his arrest. In the recording at issue here, Defendant's voice and two female voices are heard in the following exchange:

> Female 1: That they did. Ooh, okay, hey, um, this is . . . [Defendant's] sister.
>
> Female 2: Okay, Siray crying a lot, I tried to get what I can out of her.
>
> Female 1: I'm on the phone with him now.
>
> Female 2: What happened?
>
> Female 1: They, they went in my Momma's house and got him.
>
> Female 2: Well they are saying he did that to that nurse?

- 34 -

Female 1: Um, yeah, f*ck yeah, that's what they are saying.

Female 2: Why would he do that? Like is he trying to get into a gang or something?

Female 1: I don't know.

Female 2: But he didn't even know her.

Female 1: You said what [Defendant]?

[Defendant]: I didn't do it.

Female 1: He say he didn't do it.

Defendant argues on appeal that the trial court erred in denying his request to redact the hearsay statements made by Females 1 and 2, concerning a possible gang-initiation motive for the crime.

The State responds that the trial court properly admitted the challenged comments to give context to Defendant's statement immediately after it was made: "I didn't do it." The State maintains that any risk of unfair prejudice was minimal given the speculative nature of the challenged comment, along with Defendant's immediate denial and the trial court's limiting instruction.

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. A trial court's decision of whether a particular statement is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). A trial court's factual findings and credibility findings relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Id.*

Upon review, we conclude that the trial court did not err. The trial court found that the challenged comments made by Females 1 and 2 were not hearsay because they were not being offered for the truth of the matter asserted and were admissible to provide context to Defendant's statement that he "didn't do it." *See e.g.*, *State v. Brooks*, No. W2019-01802-CCA-R3-CD, 2020 WL 7252035, at *7 (Tenn. Crim. App. Dec. 9, 2020), *perm. app. denied* (Tenn. Apr. 8, 2021); *see also* Neil P. Cohen et al., Tennessee Law of Evidence,

§ 8.01 [10], 8-27 (6th ed. 2011) ("Statements designed to (1) provide a context for, or (2) permit an understanding of, another statement may not be hearsay.").

The trial court also issued a limiting instruction to the jury concerning this phone call. The trial court instructed the jury that recorded statements by other individuals were "not admitted for the truth of the matter asserted by these people" but instead was to "provide meaning to the statements made by the individual identified as [Defendant]." The court further instructed:

> You must never speculate to be true any insinuation suggested by a question asked or comment made during the course of these recorded statements. Only the statements made by the person you identify as [D]efendant may be considered by you on the question of whether a defendant is guilty or not guilty of any offense.

As noted by the parties, "[i]n most circumstances, [we] presume that a jury follows limiting instructions." *State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994).

Finally, we conclude that any error in admitting challenged comments was harmless considering the overwhelming evidence of Defendant's guilt. *State v. Chapman*, No. E2013-00839-CCA-R3-CD, 2014 WL 1829817, at *3 (Tenn. Crim. App. May 5, 2014), *no perm. app. filed*; *see* Tenn. R. App. P. 36(b). Relief is not warranted.

### F. Improper Prosecutorial Argument

Defendant argues that the trial court abused its discretion when it denied his request for a mistrial after the prosecutor engaged in improper argument during the State's rebuttal closing argument. Defendant contends that the prosecutor referenced "gang-like behavior evidence not established in the record" by insinuating that co-defendant Cowan "held a position of authority over" him. He insists that he is entitled to a new trial based upon the prosecutor's misconduct.

The State responds that the prosecutor "presented an argument using reasonable inferences from the proof presented at trial" and that because "the complained-of comment was permissible conjecture," the trial court properly exercised its discretion in denying the request for a mistrial.

A mistrial is appropriate "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441,

443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id*. This court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022)). Because counsel in criminal cases are "expected to be zealous advocates," they are afforded "great latitude in both the style and the substance of their arguments." *Id*. (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131). "Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted).

Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6. A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001).

During the State's rebuttal closing argument, the prosecutor commented on defense counsel's use of the term "commonsense" in his closing argument, noting that it was "definitely something that these two defendants cared little or nothing about having." Addressing co-defendant Cowan's involvement in the crime, the prosecutor told the jury that it had "heard about the gang membership and the family" and suggested that Defendant—in addition to wanting "something lesser" for himself—had a motive for claiming that co-defendant Cowan was not involved: he was a "loyal soldier" who thought "if I can help my cousin, associate, beat the rap too I'm going to do what I can. That's loyalty." Defendant objected and requested a mistrial based upon the prosecutor's statement, which the trial court denied.

We conclude that the trial court acted within its discretion by finding that the State's argument was not improper and by denying Defendant's request for a mistrial. The prosecutor's statement did not insinuate that co-defendant Cowan "held a position of authority over" Defendant. As noted by the State, in explaining why Defendant denied knowing co-defendant Cowan, the prosecutor referred to co-defendant Cowan as Defendant's "cousin" and "associate" and spoke in terms of "loyalty," not subservience. Moreover, the prosecutor's suggestion was a reasonable inference from the proof at trial. When questioned by investigators, Defendant gave them a fake name for the other suspect, and he denied knowing co-defendant Cowan when shown a photograph of him. At trial Defendant admitted that he lied to police, explaining "that's my friend, also my family, and in times like hard times you protect your friends and family." From this, a logical inference is that Defendant was trying to help his cousin and gang associate, co-defendant Cowan, "beat the rap." The prosecutor's argument was not improper, and Defendant is not entitled to relief on this claim.

## G. Cumulative Error

Defendant asserts that he is entitled to relief under the cumulative error doctrine. He contends that, when considered together, the multiple errors at trial more probably than not affected the jury's verdict to his detriment. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). However, Defendant has failed to establish multiple errors entitling him to relief when considered cumulatively.

## H. Excessive Sentence

Finally, Defendant contends that the trial court imposed an excessive sentence. He argues that the court abused its discretion by finding one other enhancement factor and by declining to find any mitigating factors. The State responds that the trial court properly exercised its discretion in imposing a within-range sentence.

Tennessee Code Annotated section 40-35-210(b) requires that a trial court consider the following when determining a specific sentence to impose upon a defendant:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b) (2023).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 698 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles" set out in Tennessee Code Annotated sections 40-35-102 and 103. *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The

party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In sentencing Defendant, the trial court noted that it had considered the applicable statutory scheme, the proof presented at trial and sentencing, and the presentence report. It found that Defendant had no prior convictions as an adult and, therefore, was a Range I offender. Second degree murder is a Class A felony. Tenn. Code Ann. § 39-13-210(c)(1). A Range I sentence for a Class A felony is not less than fifteen years nor more than twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1).

The trial court then addressed each mitigating factor argued by Defendant. It declined to find that Defendant lacked judgment because of his youth, highlighting that Defendant "failed to adequately demonstrate the nexus between the impact of his childhood experiences and his intellectual development" with "how those experiences impacted his thought process in the present case." Tenn. Code Ann. § 40-35-113(6). The trial court found that nothing in the record supported a finding that there was no sustained intent to violate the law, and the court determined that Defendant had no remorse for his conduct and even "collud[ed] with others to intimidate a witness." Tenn. Code Ann. § 40-35-113(11), (13). As such, the court declined to find that any mitigating factors applied.

Regarding enhancement factors, the trial court first found that Defendant had engaged in criminal behavior in addition to that necessary to establish his range. Tenn. Code Ann. § 40-35-114(1). Second, it found that Defendant "was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). The court noted that the jury had acquitted co-defendant Cowan; nevertheless, the court found that a preponderance of the evidence showed co-defendant Cowan's involvement. The trial court also found that Defendant possessed or employed a firearm during the commission of the offense and that Defendant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed as an adult." Tenn. Code Ann. § 40-35-114(9), (16). Weighing all of these factors, the court found that the appropriate sentence was twenty-five years' incarceration.

The trial court properly exercised its discretion in imposing the within-range sentence. The court considered the applicable statutory scheme, the proof presented at trial and sentencing, and the presentence report. It addressed each mitigating factor argued by Defendant and declined to apply any of them. The court also found the presence of four different enhancement factors. The trial court's sentencing decision reflects a proper application of the purposes and principles of the Sentencing Act, so the presumption of reasonableness applies. *Bise*, 380 S.W.3d at 707. Because the sentence does not defy logic and reason, no relief is warranted. *See State v. Kirkpatrick*, No. E2011-01091-CCA-R3-CD, 2013 WL 105896, at *11 (Tenn. Crim. App. Jan. 9, 2013) (noting that "micro-

management of the trial court's sentencing decisions . . . is plainly no longer permissible under *Bise* and *Caudle*"), *perm. app. denied* (Tenn. June 12, 2013).

Defendant does not dispute that the trial court made the relevant considerations, and he concedes that the trial court correctly found at least three enhancement factors: a previous history of criminal convictions or behavior, possessing or employing a firearm, and committing delinquent acts which would have constituted felonies were he an adult at the time they were committed.  Instead, his only complaint is that "the trial court erred in applying one enhancement factor and should have applied three mitigating factors."  This argument, however, "does not remove the presumption of reasonableness from a trial court's sentencing decision." *State v. Ciaramitaro*, No. W2021-00046-CCA-R3-CD, 2022 WL 1460242, at *10 (Tenn. Crim. App. May 9, 2022) (citing *Bise*, 380 S.W.3d at 707). Even if Defendant were correct, it would not entitle him to relief.

The trial court was well within its discretion to impose the twenty-five-year sentence.  Defendant's arguments to the contrary are without merit.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.


_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE


- 42 -